FRED E. HUDSPETH and MARGARET A. HUDSPETH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hudspeth v. Commissioner
Docket Nos. 5311-77, 5500-77, 5280-78, 14025-79, 14088-79, 14089-79, 14881-81, 14900-81, 25170-81, 25405-81, 25406-81, 25407-81.
United States Tax Court
T.C. Memo 1985-628; 1985 Tax Ct. Memo LEXIS 2; 51 T.C.M. (CCH) 175; T.C.M. (RIA) 85628; December 30, 1985. Isidore Feldman, for the petitioners. Carmen J. SantaMaria, for the respondent. GOFFE
MEMORANDUM OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax and additions to tax for the petitioners and the taxable years set forth below: Taxable
Sec. 6651(a) [2]
Petitioner
Docket No.
Year
Deficiency
Addition to Tax
Fred E. Hudspeth and
5311-77
1973
$88,871.00
Margaret A. Hudspeth
John Hudspeth and
5500-77
1973
1,481,821.00
Floreine Hudspeth
John Hudspeth and
5280-78
1974
1,530,574.00
Floreine Hudspeth
John Hudspeth and
14025-79
1975
64,338.74
Floreine Hudspeth
Hudspeth Pine, Inc.
14088-79
Taxable
19,072.65
year ended
May 31, 1976
Golden Pine Ranches,
14089-79
Taxable
66,933.47
Inc.
year ended
May 31, 1976
Gary N. Jackson and
14881-81
1977
223,224.00
$52,093.00
Anne E. Jackson
Andrew W. Thomas and
14900-81
1977
148,587.00
35,813.00
Susan Thomas
Roger Hudspeth and
25405-81
1977
95,543.00
22,552.00
Beverly Hudspeth
John R. Hudspeth
25406-81
1977
72,692.00
17,734.00
Ronald J. Hudspeth
25407-81
1977
294,027.00
77,412.00
and Jane Hudspeth
John Hudspeth and
25170-81
1978
123,710.00
Floreine Hudspeth
*5 After concessions by petitioners and respondent, the issues for decision are: (1) the determination of the fair market value of timber cut by Hudspeth Pine, Inc., during its taxable years ended May 31, 1973, and May 31, 1974; (2) whether petitioners John and Floreine Hudspeth and Fred E. and Margaret A. Hudspeth realized capital gain during the taxable year 1973 upon the redemption of bonds by Hudspeth Pine, Inc.; (3) whether investment tax credits claimed by Hudspeth Pine, Inc., on its federal income tax return for the taxable year ended May 31, 1976, are subject to recapture pursuant to section 47; and (4) whether petitioners Gary N. and Anne E. Jackson, Andrew W. and Susan Thomas, Roger and Beverly Hudspeth, Ronald J. and Jane Hudspeth, and John R. Hudspeth are liable for additions to tax pursuant to section 6651(a) for failure to timely file their Federal income tax returns. Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so *6 found and incorporated by this reference. At the time of filing of the petitions in each of the dockets consolidated for this case, the residence of each of the individual petitioners was Prineville, Oregon, with the exception of Gary N. and Anne E. Jackson, who resided in Durango, Colorado. Each of the following are husband and wife: Fred E. and Margaret A. Hudspeth, John and Floreine Hudspeth, Gary N. and Anne E. Jackson, Andrew W. and Susan Thomas, Roger and Beverly Hudspeth, Ronald J. and Jane Hudspeth. Fred E. Hudspeth and John Hudspeth are brothers.Anne E. Jackson, Susan Thomas, Roger Hudspeth, Ronald J. Hudspeth, and John R. Hudspeth are children of John and Floreine Hudspeth. Hudspeth Pine, Inc., had its principal place of business in Prineville, Oregon, at the time of filing of its petition, and was incorporated in the State of Oregon. With respect to the taxable years at issue, Hudspeth Pine, Inc., utilized the accrual method of accounting. For convenience, our remaining findings of fact and opinion will be grouped together by the issues to which they relate. Issue. 1. Determination of the Fair Market Value of Timber
During the taxable years at issue, Hudspeth *7 Pine, Inc. (hereinafter referred to as Hudspeth Pine or petitioner), was engaged in the business of manufacturing lumber and related products. Prior to and during the taxable years at issue, Hudspeth Pine elected to treat the cutting of lumber as a sale or exchange subject to section 631(a), which requires that the fair market value of lumber harvested in a taxable year be determined as of the first day of the taxable year. During the taxable year ended May 31, 1973, Hudspeth Pine harvested timber qualifying for treatment under section 631(a). The following schedule describes such timber and sets forth respondent's contention as to its fair market value on June 1, 1972, and the values employed by Hudspeth Pine in filing its Federal income tax return for the taxable year ended May 31, 1973: Fair Market Value per MBF
Tract [3]
Species
Volume-MBF [4]
Petitioner
Respondent
Whitney Creek
pine
1,030.93
$95
$57
fir
16.69
55
38
Aldrich Springs
pine
527.68
90
58
fir
86.61
45
29
Buck Cabin
pine
6,009.47
80
55
fir
1,318.23
40
24
Windy Point
pine
622.51
85
68
fir
4,812.69
44
17
Drake Creek
pine
16,921.04
80
53
fir
3,381.24
44
22
A-Y
pine
538.26
80
56
fir
74.72
56
22
Black Joe
pine
620.65
90
57
fir
313.24
41
22
Stevenson
pine
331.74
75
70
Mountain
fir
2,135.78
53
45
*8 The total fair market value of the timber harvested during the taxable year ended May 31, 1973, was $2,704,799.52 according to petitioner, and $1,743,408 according to respondent. The log scale (a measure of the market value of the timber once processed) of the pine timber cut by Hudspeth Pine during the taxable year ended May 31, 1973, was $185.86 per MBF. Of the timber cut by Hudspeth Pine during its taxable year ended May 31, 1973, certain logs remained in the corporation's closing inventory of May 31, 1973. The following schedule describes the logs, and sets forth the parties' respective positios as to the appropriate increase to the inventory of Hudspeth Pine. Petitioner
Respondent
Volume-
Cost
FMV [5]
Increase to
FMV
Increase to
Tract
Species
MBF
MBF
6/1/72
Inventory
6/1/72
Inventory
Buck Cabin
pine
636.75
$47.31
$80
$20,815.36
$55
$4,896.61
fir
113.00
10.96
40
3,281.52
24
1,473.52
Stevenson
pine
351.67
57.69
75
6,087.41
70
4,329.06
Mountain
fir
1,635.53
40.28
53
20,803.94
45
7,719.70
Drake Creek
pine
631.28
38.70
80
26,071.86
53
9,027.30
fir
33.60
1.51
44
1,427.66
22
688.47
[6] $78,487.75
$28,134.66
*9 During the taxable year ended May 31, 1974, Hudspeth Pine harvested timber qualifying for treatment under section 631(a). The following schedule describes such timber and sets forth the respondent's contention as to its fair market value on June 1, 1973, and the values employed by Hudspeth Pine in filing its Federal income tax return for the taxable year ended May 31, 1974: Fair Market Value per MBF
Tract
Species
Volume-MBF
Petitioner
Respondent
C.B.C. Co.
pine
1,964.49
$157
$75
fir
586.56
76
60
Dicks Bluff
pine
6,377.91
159
96
fir
1,706.91
77
78
North Wind
pine
480.65
140
99
fir
139.82
74
81
Double Corral
pine
1,741.49
149
110
fir
3,346.81
72
84
Hamilton Butte
pine
6,121.82
160
104
fir
340.96
77
95
Johnson Heights
pine
1,777.90
144
75
fir
359.43
74
60
Whitney
pine
1.14
157
112
fir
0.15
76
98
Sourdough
pine
130.76
156
94
fir
0.34
72
80
Drake Creek
pine
4,159.80
157
100
fir
1,778.60
74
82
Buck Cabin
pine
1,077.50
150
62
fir
375.26
71
41
Goldie Savage
pine
84.27
76
93
Windy Point
pine
2,148.45
155
110
fir
3,611.24
76
78
Paulina Suburb
pine
2,771.22
147
75
fir
0.10
74
60
Kidnap Springs
pine
475.39
157
123
fir
50.00
76
104
*10 The total fair market value of the timber harvested during the taxable year ended May 31, 1974, was $5,458,468.60 according to petitioner, and $3,737,363.86 according to respondent. Of the timber cut by Hudspeth Pine during its taxable year ended May 31, 1974, certain logs remained in the corporation's closing inventory of May 31, 1974. The following schedule describes the logs, and sets forth the parties' respective positions as to the appropriate increase to the inventory of Hudspeth Pine. Petitioner
Respondent
Volume-
Cost
FMV
Increase to
FMV
Increase to
Tract
Species
MBF
MBF
6/1/73
Inventory
6/1/73
Inventory
Kidnap
pine
450.00
$98.48
$157
$26,334.00
$123
$11,034.00
Springs
fir
50.00
30.87
76
2,256.50
104
3,656.50
Drake Creek
pine
550.00
39.42
157
64,669.00
100
33,319.00
fir
450.00
3.29
74
31,819.50
82
35,419.50
Double
pine
125.00
89.59
149
7,426.25
110
2,551.25
Corral
fir
375.00
30.54
72
15,547.50
84
20,047.50
Dicks Bluff
pine
521.50
87.46
159
37,308.11
96
4,453.61
fir
178.50
46.41
77
5,460.32
78
5,638.82
North Wind
pine
16.67
37.18
140
1,714.00
99
1,030.54
fir
14.48
39.26
74
503.04
81
604.40
Hamilton
pine
389.51
86.89
160
28,477.08
104
6,664.52
Butte
[7] $221,515.30
$124,419.64
*11 The timber was purchased primarily from the U.S. Forest Service (hereinafter referred to as the USFS), with additional purchases from the Bureau of Land management and fee owners. All of the timber for the two taxable years at issue was harvested from lands in or near the Ochoco National Forest or in the Malheur National Forest. Hudspeth Pine's sawmill was located in Prineville, Oregon, and was used to process all but a small percentage of the timber at issue. [8] All of the timber processed at the Hudspeth Pine sawmill in Prineville, except the timber processed from three sales, was harvested from the Ochoco National Forest. During the taxable years at issue, the USFS auctioned the cutting rights to the timber in the national forests under its control. In order to determine the minimum acceptable bids, the value of the timber was determined through the application of a number of factors to a base price, with due regard *12 for the costs of transporting the cut timber to the nearest sawmills. The locations of the available sawmills determined the geographical area of appraisal or its market. The USFS appraised most tracts of timber situated in the Ochoco National Forest to Prineville. The USFS appraised Buck Cabin and most other Malheur National Forest sales to John Day, Oregon. All of the subject timber was harvested from lands within the Prineville and John Day geographical market areas. On May 21, 1971, a severe wind storm blew down approximately 100 million board feet (100,000 MBF) of very high quality, old growth Ponderosa pine timber in the Ochoco National Forest. Very little stem breakage occurred as a result of the storm. Many of the root systems remained intact and continued to draw fluids into the downed trees. The quality of the downed timber was considerably higher than the normal quality of downed timber offered for sale by the USFS. In order to induce the mill owners in Prineville to remove the downed timber immediately, and in order to avoid blue stain (a discoloration caused by a fungus), the USFS devalued the timber when it was put up for auction. Very little incidence of blue *13 stain was found in the downed timber when harvested and deterioration of such timber was negligible. Virtually all of the downed timber was sold by the USFS, logged by the purchasers, and trucked out of the Ochoco National Forest by December 31, 1971. The speed with which the downed timber was put up for sale and harvested was unprecedented. The USFS determines the amount of timber that may be cut from each of the forests under its control during the year. The allowable annual cut, although planned for annual harvests, may be satisfied by averaging the timber cut over a 10-year period. The allowable annual cut of all species of timber for the Ochoco National Forest in 1971 and 1972 was 104,000 MBF per year. The USFS regional office decided that the downed timber that was removed would not be substituted for the annual allowable cut for 1971, and required that the local office of the USFS put up for bid an additional 104.000 MBF of timber, representing the normal allowable annual cut. As a result, in 1971 the USFS offered approximately 245,000 MBF of timber from the Ochoco National Forest, 27,000 MBF of which was to be harvested from remote areas and milled in Hines, Oregon, *14 rather than in Prineville. During the calendar year 1971, total sales of all species of timber from Ochoco was 183,575 MBF. Sales of Ponderosa pine constituted 159,000 MBF, of which 96,000 to 98,000 MBF were trees downed by the storm of May 21, 1971. Because the amount of timber made available for bid by mills in the Prineville, Oregon, area was approximately equal to the capacity of the mills, which already had moderate inventories, the bid sales in 1971 and early 1972 were not heated contests. The bidders at a USFS sale of timber knew what the minimum acceptable bid was before the actual bidding started because the information was advertised by the USFS. Advertised prices were bid up as little as 5 cents per MBF, and no more than 25 cents per MBF. The market remained comparatively noncompetitive, and the prices paid at the auctions rose only slightly until January 11, 1973, when President Richard M. Nixon removed the price controls formerly imposed upon lumber and wood products. Following the removel of these controls, the price of standing lumber rose during 1973 throughout the geographical areas under consideration. In summary, the price of timber rose gradually throughout *15 the taxable years at issue, with a steeper rise after January 11, 1973. The bid ratios [9] in the relevant geographical areas remained relatively constant throughout this time period, despite the large amount of timber auctioned in 1971. In such a market, the probative value of comparable sales decreases considerably if the date of the sale is more than 6 months from the valuation date. In particular, sales after June 1, 1973, were normally at higher prices than before that date. *16 Petitioner's expert witness, Gail Thomas, selected sales from severl forests including Deschutes National Forest, Winema National Forest, and Eldorado National Forest for use as comparables to determine the fair market value of the subject timber on the two valuation dates. He selected six sales of timber from Deschutes National Forest, which is approximately 40 miles from Pnineville, in apprasing the pine timber at issue as of June 1, 1973. At their closest points, the Ochoco National Forest and the Deschutes National Forest are approximately 50 miles apart. The USFS does not appraise Deschutes National Forest timber to Prineville, the location of the Hudspeth Pine sawmill. Hudspeth Pine purchased no cutting rights pertaining to Deschutes National Forest timber during 1971, 1972, or 1973. Mr. Thomas selected six sales of Winema National Forest timber for use as comparable sales in appraising the pine timber at issue as of June 1, 1972. All six sales of winema National Forest timber utilized by Mr. Thomas in appraising pine timber as of June 1, 1972, occurred subsequent to the valuation date. The Winema National Forest is situated even farther from the geographical market areas *17 of the subject timber than the Deschutes National Forest. None of the timber at issue was harvested from the Winema National Forest, nor did hudspeth Pine purchase any cutting rights pertaining to Winema National Forest timber during 1971, 1972, or 1973. The Eldorado National Forest is situated approximately 500 miles from Prineville.Mr. Thomas used values determined for timber in the Eldorado National Forest by the Court in Peek v. Commissioner,T.C. Memo. 1983-224, as comparables in appraising the pine and fir timber at issue as of June 1, 1973. None of the subject timber was harvested from the Eldorado National Forest, nor did Hudspeth Pine purchase any cutting rights pertaining to Eldorado National Forest timber during 1971, 1972, or 1973. Mr. Thomas did select 11 sales of Ochoco National Forest timber, five sales of pine and six sales of fir, for use as comparable sales in appraising the pine and fir timber at issue as of June 1, 1972. The Ochoco National Forest sales used occurred between January 8, 1973, and May 14, 1973, 7-1/2 to 11-1/2 months subsequent to the valuation date. The bid price for these sales was $79.50 per MBF. The sales were appraised *18 at a market that was $7.10 higher than the subject sales. None of the sales of pine or fir was used for the appraisal of timber as of June 1, 1973, despite being closer to that date than to the valuation date for which they were used. For the valuation date of June 1, 1973, Mr. Thomas selected six sales of Ochoco National Forest timber for use as comparable sales in appraising pine timber, and eight sales of Ochoco National Forest timber for use as comparable sales in appraising fir timber. Twelve of the 14 sales occurred subsequent to the valuation date. Mr. Thomas did not use comparable sales from Malheur National Forest, the location of the sales from the Buck Cabin tract, for the valuation of timber on either of the two valuation dates as he considered them not to be probative of fair market value. Petitioner's expert culled the sales to be used as comparables almost exclusively on the basis of whether or not the bid ratio for sales of pine was at least 40 percent or greater, whether or not the sale was in fact comparable in time or location to the timber being valued in this case. This minimum bid ratio standard was applied despite historical average bid ratios for sales *19 of Ochoco National Forest pine timber during 1966, 1967, 1968, 1969, and 1970 of 36 percent, 27 percent, 29 percent, 32 percent, and 22 percent, respectively. The bid ratio of a competitively bid sale will exceed the bid ratio of a sale which does not attract much spirited bidding.Selling prices of timber also tend to be higher in areas in which high bid ratios prevail than in areas in which low bid ratios prevail. However, lack of spirited bidding and low bid ratios were typical for Ochoco Forest timber sales throughout the taxable years at issue. Petitioner's expert also determined that the fair market value of the lumber sold by Hudspeth Pine was from $23.52 to $53.73 in excess of the log scale values of what would normally be considered to be the comparable sales. As a result, virtually all of the comparable sales from forests in close proximity to the tracts at issue were rejected by petitioner's expert as being much lower than the market. The sales used by Mr. Thomas as comparables after this winnowing process were not adjusted to account for differences between the comparables and the subject timber in terms of quality, accessibility, quantity, or location. Respondent's *20 expert witness, Kenneth F. Taylor, used the comparable sales method in his determination of the fair market value of timber cut by Hudspeth Pine during its taxable years ended May 31, 1973, and May 31, 1974. All of the tracts selected by Mr. Taylor as comparable sales were situated within the Prineville and John Day geographical market areas. The tracts selected were chosen for their locations and their comparability as to species composition, identity of the seller, market area, and quality of timber. For example, the Stevenson Mountain and C.B.C. Company tracts were not owned by the USFS, and thus sales other than USFS sales were used as comparables because of the increased costs associated with USFS contracts. Respondent's expert visited each of the tracts used in making his valuations to make a visual evaluation of the quality of the timber, the accessibility, and the location of the tracts for comparison purposes. All of the sales of timber selected as comparable sales by Mr. Taylor occurred within 6 months before or after the appropriate valuation dates of June 1, 1972, and June 1, 1973. Mr. Taylor adjusted the cash bid prices of his comparable sales to account for differences *21 between the comparable timber and the subject timber in terms of accessibility and location. Adjustments for quality were made only for the valuations of pine timber, as the grade differences for the other species did not cause a variance of more than one to two dollars per MBF. Respondent's expert also allowed for differences in road costs and logging costs for the different tracts.Finally, Mr. Taylor allowed for the increased values resulting from the lifting of price controls on January 11, 1973. The first issue for decision is, therefore, the determination of the fair market value of qualifying timber cut by Hudspeth Pine during its taxable years ended May 31, 1973, and May 31, 1974. We consider it appropriate to observe that valuation issues are normally far better suited to settlement than to disposition by the Court, as any valuation "is inherently imprecise and capable of resolution only by a Solomon-Like pronouncement." See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). Although the parties may anticipate that the Court will divide the difference between the valuations *22 of the parties, there is no inherent guarantee that the Court will not find the evidence of one of the parties ultimately persuasive. Buffalo Tool & Die Mfg. Co. v. Commissioner,supra at 452. Nonetheless, as the parties have failed to reach settlement on this issue, we shall determine the fair market value of the subject timber on the two relevant valuation dates. Under section 631(a), which governs gain or loss on the cutting of timber upon an appropriate election by the taxpayer, [10] fair market value is to be determined as of the first day of the taxable year during which the timber is cut. In this case, the relevant valuation dates are June 1, 1972, and June 1, 1973. The valuation standard is defined as the selling price at which the timber would be sold in a hypothetical transfer between a willing seller and a willing buyer as of the given date, both buyer and seller possessing the most reliable and accurate information available on the valuation date, and both parties being under no compulsion to buy or sell. Sec. 1.631-1(d)(2), Income Tax Regs.; Buse v. Commissioner,71 T.C. 1129, 1135-1136 (1979). Many factors are to be considered, *23 including the character, quality, quantity, location, and accessibility of the timber. Sec. 1.611-3(f)(1), Income Tax Regs. The normal starting point for the determination of value, however, is the use of comparable sales, which are of timber similar to the subject timber, and of reasonable proximity in time. The sales prices of the comparable properties must then be adjusted to reflect differences between the subject and comparable properties with respect to quality, quantity, accessibility, and location. *24 Petitioner relies upon the temporary overloading of the market caused by the wind storm in the Ochoco National Forest in early 1971 to justify the use of only selected comparable sales, none of which is proximate in time to the valuation date. While there was a minor dislocation in local market prices causing a temporary reduction in bid ratios, the effect of the storm upon the market was negligible by the initial date upon which the timber in this case is to be valued. Further, the sales prices for the Prineville, Oregon, area continued to follow the slowly rising market pattern of previous years until after the lifting of price restrictions by President Nixon, an event occurring after the first valuation date. The selection of comparables by petitioner's expert appears to have been based primarily on whether the sale value of the timber was equal to or greater than the value which petitioner wishes to have established as the fair market value of the subject timber on the two valuation dates. The rejection of the majority of the sales which were in close proximity geographically and chronologically to the subject sales makes his entire report suspect, particularly when the only *25 reasons given for the rejection were that the comparable sales were "lower than the market." If the bulk of the timber at a particular time and place is sold at a reduced bid price, by definition the market as a whole is low, regardless of how much petitioner would prefer that the market be different. The bias toward his employer's viewpoint that is apparent in both his testimony and his report gives less credence to Mr. Thomas' factual determinations than would otherwise be given, based upon his experience and knowledge. We also do not find the use of sales in areas as much as 500 miles from the tracts in issue even remotely relevant. The values determined in Peek v. Commissioner,T.C. Memo. 1983-224, were determined partially with reference to USFS sales coinciding chronologically only partially with the taxable years relevant in this case. There is, however, no basis under the law for extrapolation of the values determined in that case to determine the values of timber in a different area, valued at different times, and of presumably varying character, quality, quantity, and accessibility. Buse v. Commissioner,supra.
Respondent's *26 expert, however, reviewed all sales in the appropriate geographical areas for periods both directly before and directly after the valuation dates. Although his results differ from the values found for each tract's timber in the statutory notice of deficiency, even reasonable men have been known to differ, and reasonable experts differ frequently. [11] Mr. Taylor's methodology and consideration of all of the relevant factors, as set forth in section 631(a), are persuasive as to the fair market values of the timber, and we find for respondent on this issue. Issue 2. Capital Gain Upon Redemption of Bonds by Hudspeth Pine
On December 1, 1962, the shareholders of Hudspeth Pine elected to be treated, for Federal income tax purposes, as a small business corporation pursuant to the provisions of Subchapter S of Chapter A, Subtitle 1, of the Internal *27 Revenue Code. From the year of such election through its taxable year ended May 31, 1975, Hudspeth Pine filed its Federal income tax returns as a Subchapter S corporation. On December 1, 1962, at the time of the Subchapter S election, the capital stock account of Hudspeth Pine was $120,000: $90,000 or 75 percent of which represented the investment made by John Hudspeth and his wife, Floreine Hudspeth, and $30,000 or 25 percent of which represented the investment of John's brother, Fred E. Hudspeth and his wife, Margaret A. Hudspeth. The number of shares held and percentage of ownership from the formation of Hudspeth Pine through the taxable year ended May 31, 1973, were as follows: Shareholder
Shares Owned
Percentage of Ownership
John Hudspeth
4,800
40 percent
Floreine Hudspeth
4,200
35 percent
Fred E. Hudspeth
1,800
15 percent
Margaret A. Hudspeth
1,200
10 percent
12,000
100 percent
For its taxable years from December 1, 1962, through May 31, 1973, Hudspeth Pine reported the following undistributed taxable income, which was allocated to its shareholders for income tax purposes: Undistributed Taxable Income
Taxable Year's
John and
Fred E. and
Taxable year
Undistributed
Floreine
Margaret
Ended
Taxable Income
Hudspeth
Hudspeth
11/30/63
$37,419.22 $28,064.42 $9,354.80 11/30/64
274,427.40 205,820.55 68,606.85 11/30/65
99,349.19 74,511.89 24,837.30 11/30/66
54,982.91 41,237.18 13,745.73 11/30/67
(613,683.45)
(460,262.59)
(153,420.86)
11/30/68
148,812.35 111,609.26 37,203.09 11/30/69
249,534.56 187,150.92 62,383.64 11/30/70
(635,098.40)
(476,323.80)
(158,774.60)
11/30/71
840,935.06 630,701.30 210,233.76 5/31/72
325,693.41 244,270.06 81,423.35 5/31/73
1,591,914.42 1,193,935.82 397,978.60 *28 In 1951, Fred E. and Margaret A. Hudspeth acquired bonds issued by Hudspeth Pine at a cost of $88,420.94. In the taxable year 1973, Hudspeth Pine redeemed the bonds for $88,420.94. Similarly, in 1951, John and Floreine Hudspeth acquired bonds issued by Hudspeth Pine at a cost of $217,262.83. In the taxable year 1973, Hudspeth Pine redeemed the bonds for $217,262.83. No gains or losses with respect to these redemptions were reported by either Fred E. and Margaret A. Hudspeth or John and Floreine Hudspeth on their Federal income tax returns for the taxable year 1973. The issue is whether the redemptions for the Hudspeth Pine bonds owned by John and Floreine Hudspeth and Fred E. and Margaret A. Hudspeth resulted in gain to the taxpayers. The amount of gain or loss is determined by the application of the Subchapter S provisions. Secs. 1371 et seq. Hudspeth Pine, as an electing small business corporation, was not a taxable entity but served as a conduit to the shareholders of the income, losses, and credits attributable to its trade or business, regardless of whether such income was distributed. Under section 1376(a), the amount of undistributed taxable income that the shareholder *29 includes in his or her gross income under section 1373(b) is applied to increase the basis of the stock held by the shareholder. Under section 1376(b)(1), a net operating loss of an electing small business corporation is applied first to reduce the basis of the shareholder's stock, but not below zero. If the net operating loss exceeds the basis of the stock, the excess net operating loss is applied to reduce the shareholder's basis in any indebtedness of the corporation to the shareholder. Sec. 1376(b)(2). This application of the net operating loss to the reduction of basis in either stock or indebtedness is a purely mechanical operation. In this case, the basis in the stock held by the shareholders was increased each taxable year from 1962 through the taxable year ended November 30, 1966, by the total amount of $466,178.72. The bases of the bonds were unchanged during this period. The bases for the Hudspeth Pine stock and bonds held by the shareholders as of November 30, 1966, were as follows: Basis in
Basis in
Stock
Bonds
John and Floreine Hudspeth
$439,634.04
$217,262.83
Fred E. and Margaret A. Hudspeth
146,544.68
88,420.94
$586,178.72
$305,683.77
*30 In the taxable year ended November 30, 1967, Hudspeth Pine sustained a net loss in the amount of $613,683.45, 75 percent of which was allocated to John and Floreine Hudspeth and 25 percent of which was allocated to Fred E. and Margaret A. Hudspeth. This loss was first applied to reduce the basis in the stock held by the shareholders. As the loss exceeded the basis of the stock, the excess in the amount of $27,504.73 was applied to reduce the basis of the bonds, in the amount of $20,628.55 for the bonds held by John and Floreine Hudspeth, and in the amount of $6,876.18 for the bonds held by Fred E. and Margaret A. Hudspeth. Hudspeth Pine realized undistributed taxable income during the taxable years ended November 30, 1968, and November 30, 1969. The amounts allocated to the shareholders were applied to increase the basis of their stock pursuant to section 1376(a). The undistributed taxable income was not applied to increase the bases of the bonds held by the shareholders. The bases of the stock and bonds held by the taxpayers as of November 30, 1969, were as follows: Basis in
Basis in
Stock
Bonds
John and Floreine Hudspeth
$187,150.92
$196,634.28
Fred E. and Margaret A. Huspeth
62,383.64
81,544.76
$249,534.56
$278,179.04
*31 In the taxable year ended November 30, 1970, the corporation sustained a net loss in the amount of $635,098.40. This amount was first applied, under section 1376(b)(1), to reduce the basis of the stock to zero. As the amount of the loss exceeded the basis of the stock, the excess in the amount of $236,751.49 was applied to reduce the basis of the bonds held by the shareholders. After this reduction, the basis of the bonds held by John and Floreine Hudspeth was $19,070.66 and the basis of the bonds held by Fred E. and Margaret A. Hudspeth was $22,356.89. There were no further net operating losses in the taxable years before the redemption of the bonds in the taxable year 1973 and thus no further adjustments to the bases of the bonds. Respondent argues that the taxpayers realized capital gain upon the redemption of the bonds determined as follows: John and Floreine
Fred E. and Margaret
Hudspeth
Hudspeth
Original Basis of Bonds
$217,262.83 $88,420.94 Reduction in Basis on
November 30, 1967
(20,628.55)
(6,876.18)
Reduction in Basis on
November 30, 1970
(177,563.62)
(59,187.87)
Basis Upon Redemption
$ 19,070.66 $22,356.89 Redemption Price
217,262.83 88,420.94 Capital Gain
$198,192.17 $66,064.05 *32 Petitioner's sole argument is that they were unable to fully utilize the tax benefits of the net operating losses that passed through to them as shareholders for the taxable years ended November 30, 1967, and November 30, 1970. They argue that the amounts of net operating loss that did not result in tax benefit to the shareholders should not be applied to reduce the basis of the indebtedness held by them, citing the tax benefit rule and section 111. Petitioners have failed to cite any authority under which the mechanical reductions in the bases of the bonds under section 1376(b) are affected by the ability of the shareholder to receive full tax benefit from the net operating losses passed through to them under section 1373(b). Similarly, petitioners have totally failed to help this Court determine any fashion in which section 111, which excludes recoveries of bad debts, prior taxes, and delinquency amounts from taxation in later taxable years, is even remotely relevant to the reductions in basis mandated by section 1376(b)(2). Accordingly, the Commissioner's determinations that John and Floreine Hudspeth and Fred E. and Margaret A. Hudspeth have realized capital gains in the *33 amounts of $198,192.17 and $66,064.05, respectively, are sustained. Issue 3. Investment Tax Credit Recapture by Hudspeth Pine
On June 1, 1973, the 3,000 shares of stock of Hudspeth Pine held by Fred E. and Margaret A. Hudspeth were redeemed by the corporation. On or about December 30, 1975, John and Floreine Hudspeth sold their 9,000 shares of Hudspeth Pine to Hudspeth Sawmill Company, a partnership. This constituted all of the remaining issued and outstanding shares of Hudspeth Pine. Thereafter, Hudspeth Sawmill Company was the sole shareholder of Hudspeth Pine. After December 30, 1975, and prior to May 31, 1976, the Subchapter S election for Hudspeth Pine was terminated. On March 24, 1976, Hudspeth Holding Corporation was incorporated. On May 31, 1976, certain assets of Hudspeth Pine including the following items, were transferred at their adjusted basis to Hudspeth Holding Corporation in exchange for all of the issued and outstanding stock of such transferee corporation: Item
Cost
Logging equipment
$280,318.95
Shop equipment
626.26
Yard equipment
2,932.12
On its Federal income tax return for the taxable year ended May 31, 1976, Hudspeth Pine *34 claimed an investment tax credit in the amount of $12,322.65 for the purchase of the above-described equipment. The following assets of Hudspeth Pine were not transferred by it to Hudspeth Holding Corporation on May 31, 1976, but rather were retained by Hudspeth Pine: [12]
Item
Book Value
Cash
$ 6,074.44
Notes and accounts
3,744,086.39
receivable
Inventory
1,471,436.50
Other assets
552,048.40
$5,773,645.73
On or about November 18, 1976, Hudspeth Pine was formally dissolved. Upon dissolution, the capital stock of Hudspeth Holding Corporation held by Hudspeth Pine was distributed by the dissolving corporation to its shareholder, Hudspeth Sawmill Company. The primary *35 trade or business of Hudspeth Holding Corporation, from which it derived 92 percent of its gross income during the taxable year ended December 31, 1976, was that of renting logging equipment. The issue for decision is whether Hudspeth Pine may claim an investment tax credit for the items transferred to Hudspeth Holding Corporation for which an investment tax credit was claimed in the same taxable year. Section 38 allows a credit against income tax for investment in "section 38 property" which is defined under section 48(a)(1) to include generally depreciable, tangible personal property having a useful life of at least 3 years. The amount of the credit depends on the amount of the taxpayer's "qualified investment," as defined by section 46(a)(2). Section 1.46-3(a)(2), Income Tax Regs., provides that the cost or basis of section 38 property placed in service and disposed of during the same taxable year shall not be taken into account in computing the amount of "qualified investment" unless section 1.47-3, Income Tax Regs., provides otherwise. Respondent contends that the credit is either unavailable due to the otherwise qualified investment property having been placed in service *36 and disposed of during the same taxable year or, alternatively, that the credit must be recaptured under section 47. Hudspeth Pine argues that its investment tax credit claim is proper, and that the credit is not subject to recapture because the transfer to Hudspeth Holding Corporation was not a disposition. Petitioner relies on the exception to the general recapture rule set forth in section 1.47-3(f), Income Tax Regs., referred to as the "mere change in form" exception, and cites Loewen v. Commissioner,76 T.C. 90 (1981), in support of its argument. The pertinent parts of section 47 provide: SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY. (a) General Rule.--Under regulations prescribed by the Secretary-- (1) Early Disposition, Etc.--If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable *37 years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property. * * * (b) Section Not to Apply in Certain Cases.--* * * * * * For purposes of subsection (a), property shall not be treated as ceasing to be section 38 property with respect to the taxpayer by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business. Section 1-47-3(f)(l)(i) and (ii), Income Tax Regs., provides that a transfer of section 38 property pursuant to a change in form of conducting a trade or business results in an exemption from recapture, but only if four conditions are met: (a) The section 38 property * * * is retained as section 38 property in the same trade or business, (b) The transferor (or in a case where the transferor is a partnership, estate, trust, or electing small business corporation, the partner, *38 beneficiary, or shareholder) of such section 38 property retains a substantial interest in such trade or business, (c) Substantially all the assets (whether or not section 38 property) necessary to operate such trade or business are transferred to the transferee to whom such section 38 property is transferred, and (d) The basis of such section 38 property in the hands of the transferee is determined in whole or in part by reference to the basis of such section 38 property in the hands of the transferor. The parties have stipulated, and we have found, that only a small portion of the assets of Hudspeth Pine were transferred to Hudspeth Holding Corporation on May 31, 1976, and that these assets were transferred without any operating capital or other resources with which to continue the trade or business previously conducted by Hudspeth Pine. The ratio of assets retained versus assets transferred in Loewen v. Commissioner,supra was 1:1, while the comparable ratio, based on the record before us, is approximately 20:1. Loewen is also clearly distinguishable on its facts. In that case, this Court found that the failure to transfer valuable farmland *39 necessary for the continued operation of the business was not conclusive of a corresponding failure to transfer substantially all of the operating assets. The property was leased to the transferee for its use, and there were valid reasons for avoiding an actual transfer of title. No reasons have been offered by Hudspeth Pine as to why to items that were not transferred were retained, nor is there any indication that the retained items were leased by Hudspeth Pine to Hudspeth Holding Corporation. However, even if we were to find that substantially all of the operating assets for a trade or business had been transferred, the trade or business of the transferee must be the same as that of the transferor. Sec. 1.47-3(f)(1)(ii)(a), Income Tax Regs. Petitioner has presented no evidence to support its contention that Hudspeth Holding Corporation continued the same trade or business conducted by Hudspeth Pine, i.e., that of manufacturing lumber and related products. To the contrary, the Federal income tax return of Hudspeth Holding Corporation for the taxable year ended December 31, 1976, reveals that 92 percent of the gross income of the company was from rental of logging equipment. *40 We hold, therefore, that the transfer of assets from Hudspeth Pine to Hudspeth Holding Corporation on May 31, 1976, was a disposition of the section 38 property within the same taxable year as the year that it was placed in service. Sec. 47. Issue 4. Section 6651(a) Additions to Tax
Hudspeth Sawmill Company, a partnership, commenced its business of manufacturing lumber and related products on January 1, 1976. During the taxable year 1977, Hudspeth Sawmill Company was owned by the following partners (hereinafter referred to collectively as petitioners): Partner
Percentage of Ownership
Ronald J. Hudspeth
20 percent
Jane Hudspeth
10 percent
Roger Hudspeth
15 percent
John R. Hudspeth
15 percent
Anne E. Jackson
20 percent
Susan Thomas
10 percent
Andrew W. Thomas
10 percent
100 percent
All of the individuals named above except Jane Hudspeth, wife of Ronald J. Hudsepth, and Andrew W. Thomas, husband of Susan Thomas, are children of John and Floreine Hudspeth. Gary N. and Anne E. Jackson, Andrew W. and Susan Thomas, Roger and Beverly Hudspeth, John R. Hudspeth, and Ronald J. and Jane Hudspeth each filed, on Form 4868, a timely application for *41 an automatic 2-month extension of time in which to file their Federal income tax returns for the taxable year 1977. No payments of income tax were made with any of the applications as the income tax liability for the taxable year 1977 was estimated by petitioners to have been satisfied by amounts previously withheld from salaries: Paid before
Petitioners
Estimate of Tax
April 15, 1978
Gary N. and Anne E. Jackson
$9,011
$9,011
Andrew W. and Susan Thomas
5,334
Roger and Beverly Hudspeth
3,500
3,897
John R. Hudspeth
Ronald J. and Jane Hudspeth
22,000
22,034
Thereafter, each husband and wife and John R. Hudspeth filed timely applications for additional extensions of time to August 15, 1978, September 15, 1978, and October 15, 1978, on Forms 2688. These requests for additional extensions of time were marked as "approved" by the Commissioner. The reason given for the request for extension of time for filing of the return on each of the Forms 2688 was that Hudspeth Sawmill Company, in which each of the petitioners was a partner, did not yet have the actuarial information necessary for the computation of its employee benefit program contribution *42 deduction. [13] Although this information was not, in fact, available, the primary reason why the petitioners were unable to complete their returns was the failure of Hudspeth Sawmill Company to complete its records for the preparation of its return. Hudspeth Sawmill Company filed its Federal partnership return of income, Form 1065, for the taxable year 1977 on October 11, 1978. A series of timely Applications for Extension of Time to File (Forms 2758) preceded the filing of the return. The partnership's return reflected a realized capital gain in the amount of $1,694,584, and an ordinary loss in the amount of $778,999 before deduction for the contribution to an employee benefit plan in the amount of $56,045. Each of these items was passed through to the partners on a pro rata basis. The amount of contributions made to the employee benefit plan did not affect the amount of capital gain reportable by each of the partners. Federal income tax returns for the taxable year 1977 were *43 filed by petitioners on the following dates: Petitioners
Date
Gary N. Jackson and Anne E. Jackson
10/11/78
Andrew W. Thomas and Susan Thomas
10/15/78
Roger Hudspeth and Bevrly Hudspeth
10/13/78
John R. Hudspeth
10/11/78
Ronald J. Hudspeth and Jane Hudspeth
10/13/78
The actual income tax liabilities for the taxpayers shown on the returns filed were substantially in excess of the amounts withheld and the amounts estimated as the total tax liabilities on the requests for extension of time within which to file the returns. The income tax liability computed without regard to the minimum tax was reduced to zero by the investment tax credit for all but one of the petitioners. However, each of the petitioners owed minimum tax because of the capital gain realized by the partnership. The total income tax liability for Gary N. and Anne E. Jackson and for Ronald J. and Jane Hudspeth was increased by recapture of investment tax credit from prior taxable years. The total income taxes paid by the petitioners with the returns as filed were as follows: Minimum
Investment tax
Total Income
Original
Petitioner(s)
Tax
Credit Recapture
Tax Paid
Estimate
Gary N. and Anne E. Jackson
$24,079
$22,378
$46,457
$9,011
Andrew W. and Susan Thomas
23,637
23,637
Roger and Beverly Hudspeth
19,645
19,645
3,500
John R. Hudspeth
17,564
17,564
Ronald J. and Jane Hudspeth
35,582
33,567
[14] 74,043
22,000
*44 The Commissioner determined deficiencies in income tax with respect to each of the petitioners. He also determined additions to tax under section 6651(a)(1) for failure to file timely returns. After concessions by the parties, the only issue for decision is whether petitioners Gary N. and Anne E. Jackson, Andrew W. and Susan Thomas, Roger and Beverly Hudspeth, John R. Hudspeth, and Ronald J. and Jane Hudspeth are liable for additions to tax pursuant to section 6651(a) for failure to timely file their Federal income tax returns. Petitioners argue that each of them filed for extensions of time within which to file their returns, and that each of them made an estimate of his tax liability based upon the facts then available to them. Respondent contends that approval of an extension of time within which to file a return is invalid when the actual reasons for the delay would not *45 constitute reasonable cause for delay. Alternatively, respondent argues that petitioners either had full knowledge or should have had knowledge that capital gains realized by Hudspeth Sawmill Company would result in substantial minimum tax liability that was not satisfied by the amounts paid on or before the date upon which the return was originally due. He, therefore, argues that the estimated taxes set forth on the applications are inaccurate, and that the application forms are invalid as a result. A preliminary matter is respondent's apparent attempt, by means of his alternative argument, to assess an addition to tax under section 6651(a)(2) for failure to pay the tax shown on the return on the date prescribed for payment of such tax. Respondent did not amend his answer. The matter is, therefore, untimely and we will not consider this issue. [15]Seligman v. Commissioner,84 T.C. 191, 197-199 (1985). A return made on the basis of the calendar *46 year must be filed on or before the 15th day of April following the close of the calendar year. Sec. 6072. Section 6081(a) permits the Commissioner to grant a reasonable extension of time within which to file a return. Except for taxpayers who are abroad, no extension may be granted for more than 6 months. The first extension of 2 months [16] is automatic upon the timely filing of a Form 4868. Sec. 1.6081-4, Income Tax Regs. The extension of time for filing the return does not also extend the time for payment of the tax, which must be paid in full upon the normal due date of the return. Sec. 1.6081-4(b). If an automatic extension has been requested, a taxpayer may seek additional extensions of time within which to file a return. Under section 1.6081-1(b), Income Tax Regs., a taxpayer must file a written application on a Form 2688, or in a letter which is properly signed, which specifies the particular return for which the extension of time for filing is desired, and which includes a full explanation of the reasons for requesting *47 the extension. Consent is granted only upon reasonable cause, and is not granted if the sole reason for delay is the taxpayer's own laxity. In this instance, the Commissioner approved the applications for extensions even though respondent now insists that the reasons given were inadequate because the amount of contributions to be made to the pension plan would not affect the ultimate minimum tax liability of the partners. The information that was not available was necessary for the accurate and complete preparation of petitioners' returns. The computation of this amount was not available as of April 15, 1978. No false or misleading statements were made on the applications that would justify invalidation of the Commissioner's approval of the applications as filed. Respondent argues, however, that the estimates of tax accompanying the applications were not properly computed, and that the applications were invalid under section 1.6081-4(a)(4), Income Tax Regs., which provides: [17]
Such application for extension must show the full amount properly estimated as tax for such taxpayer for such taxable year, and such application must be accompanied by the full remittance of the amount *48 properly estimated as tax which is unpaid as of the date prescribed for the filing of the return. Petitioners did not know the amounts of capital gain realized by the partnership, nor did they have sufficient information by which they could estimate that their tax liabilities would be in excess of the amounts previously paid. The estimates of tax liability were proper in light of the information available to petitioners when they filed for the automatic extensions. Further, petitioners filed timely requests for additional extensions and filed their returns within the extended time period. Therefore, we find for petitioners on this issue. A number of items disallowed with respect to the petitioners were *49 not conceded by either petitioners or respondent. In the absence of any evidence in the record or arguments on brief, these determinations by the Commissioner are deemed conceded by petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). To reflect the foregoing, Decisions will be entered under Rule 155 in docket Nos. 5500-77, 5280-78, 14025-79, 14089-79, 14881-81, 14900-81, 25170-81, 25405-81, 25406-81, and 25407-81.
Decisions will be entered for the respondent in docket Nos. 5311-77 and 14088-79.
Footnotes
1. Cases of the following petitioners were consolidated for trial, briefing and opinion: John Hudspeth and Floreine Hudspeth, docket Nos. 5500-77, 5280-78, 14025-79, and 25170-81; Hudspeth Pine, Inc., docket No. 14088-79; Golden Pine Ranches, Inc., docket No. 14089-79; Gary N. Jackson and Anne E. Jackson, docket No. 14881-81; Andrew W. Thomas and Susan Thomas, docket No. 14900-81; Roger Hudspeth and Beverly Hudspeth, docket No. 25405-81; John R. Hudspeth, docket No. 25406-81; Ronald J. Hudspeth and Jane Hudspeth, docket No. 25407-81.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
3. All of the tracts listed in this and all other tables in this opinion are in or near the Ochoco National Forest with the exception of Buck Cabin which is in or near the Malheur National Forest. ↩
4. "MBF" is a unit of measurement used to describe timber value, and is equivalent to a thousand board feet of timber Scribner scale.↩
5. Fair Market Value. ↩
6. An adjustment to inventory in the amount of $78,482.67 was shown by Hudspeth Pine on its return for the taxable year ended May 31, 1973.↩
7. An adjustment to inventory in the amount of $221,081.41 was shown by Hudspeth Pine on its return for the taxable year ended May 31, 1974.↩
8. The timber processed from the Malheur National Forest was processed at the sawmill in John Day, Oregon.↩
9. The bid ratio is the bid price as a percentage of the lumber selling value as appraised by the USFS, or as a percentage of timber scale value, which is generally expressed in terms of the values determined by the Western Wood Products Association. The Western Wood Products Association (hereinafter referred to as the WWPA) collects statistical information from lumber companies in 12 western states. From this information, the WWPA compiles two basic sets of statistics. One is average lumber prices by grade groups, and the other is lumber price indices which are published on a regular basis. These lumber price indices are used by Federal agencies and private companies for pricing their timber for purposes of sale, although the indices themselves only indicate price trends. The sales data included in establishing index prices of Ponderosa Pine and Douglas Fir, by species groups for May and June 1972 and May and June 1973, covered El Dorado Natioal Forest, Winema National Forest, and Deschutes National Forest, among others. The WWPA index for Ponderosa Pine was $108.81 for the calendar year 1970 and was $152.99 on June 1, 1972.↩
10. Section 631(a) reads as follows: (a) ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE.--If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * *↩
11. Respondent's expert, in some instances, valued the timber at prices either higher or lower than those set forth in the statutory notice of deficiency. Respondent has not attempted to amend his answer to determine an increased deficiency to the extent that the aggregate values now claimed exceed the totals set forth in the notice.↩
12. Hudspeth Pine objects on brief to the values listed for assets transferred and retained. The values and descriptions of each of these items have been stipulated and, under Rule 91(e), stipulations are treated as conclusive admissions which shall not be qualified, changed, or contradicted in whole or in part without the permission of the Court. No such permission has been sought, and we will not permit Hudspeth Pine to attempt to qualify, change, or contradict the stipulated figures.↩
13. The reasons given on the Forms 2688 filed by John R. Hudspeth were that the taxpayer "has been unable to secure complete date to make a correct return, due to complicated tax transactions."↩
14. An investment tax credit in the amount of $29,895 was applied to reduce the income tax liability before minimum tax to $34,789, for a balance of $4,894. To this amount was added minimum tax in the amount of $35,582 and recapture of a prior year's investment tax credit in the amount of $33,567.↩
15. This Court does not have jurisdiction to redetermine the addition to tax for late payment because it is not attributable to a deficiency. Estate of Young v. Commissioner,81 T.C. 879↩ (1983).
16. The automatic extension is for a period of 4 months for taxable years beginning after December 31, 1982. Sec. 1.6081-4, Income Tax Regs.↩
17. This regulation applies to the automatic extension of time in which to file which does not require approval by the Commissioner if the requirements under sec. 1.6081-4, Income Tax Regs.↩, are met. Respondent's argument appears to be that an improper payment of estimated tax paid with the automatic extension invalidates all applications for extensions of time in which to file whether or not the applications for automatic extensions are reviewed or marked as "approved."